IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Michelle S. Washington, | ) Civil Action No. 8:08-2592-RBH-BHH |
| Plaintiff, | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Michael J. Astrue, | ) **OF MAGISTRATE JUDGE** |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

This case is before the Court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff, Michelle S. Washington, brought this action pursuant to Section 205(g) of the Social Security Act, as amended, (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding her claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

## **RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS**

The plaintiff was 42 years old at the time of the Administrative Law Judge's (ALJ) decision. (R. at 80.) The plaintiff graduated from high school with special education assistance and worked in the past as a janitor and housekeeper. (R. at 68, 88, 198-99.) From January 2007 through November 2007, plaintiff worked four to five hours per day, five days a week, as a janitor at an elementary school. (R. at 195-96.) She claims she became disabled on February 1, 2005, due to depression and vision problems. (R. at 80-84, 87.) The plaintiff later alleged disability due to mental retardation. (See, e.g., R. at 197.)

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income benefits (SSI) in July 2005. (R. at 80-84) Her applications were denied in initial and reconsidered determinations. (R. at 24, 25, 66-68, 774-79). Following a *de novo* hearing, (R. at 192-213), in a decision dated January 14, 2008, the ALJ found that the plaintiff had retained the functional capacity to perform her past unskilled light work as a housekeeper and was, therefore, not disabled within the meaning of the Act. (R. at 12-23.) As the Appeals Council denied the plaintiff's request for review (R. at 4-7), the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant met the insured status requirements of the Social Security Act through September 30, 2007.
>
> (2) The claimant has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq*).
>
> (3) The claimant has the following severe impairments: a right eye cataract and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to work with no requirement for fine visual acuity, with simple routine repetitive one and two step tasks, in a low stress non-sequential production setting (defined as no decision-making and changes in the work setting), and no requirement for complex reading, writing, or math computations.
>
> (6) The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance

of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(7) The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2005, through the date of this decision (20 CFR. 404.1520(f) and 416.920(f)).

## **APPLICABLE LAW**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. §423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. *See* 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. Social Security Ruling ("SSR") 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966). Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**DISCUSSION**

The plaintiff contends that the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) failing to properly consider evidence of her visual acuity; (2) failing to find that her impairments satisfied the criteria of Listing 12.05(C); and (3) failing to consider the combined effects of her impairments. The plaintiff further contends that the case should be remanded for an incomplete record. The Court will address each objection in turn.

**I.**     **Visual Acuity**

The plaintiff complains that the ALJ erred in concluding that she had visual acuity of 20/40 with the use of glasses. (R. at 20, 21.) Dr. Harriett Steinert, a general practitioner, performed a consultative exam on November 22, 2005. (R. at 177-78.) The doctor's physical exam of the claimant revealed a large cataract over the right eye. (R. at 177.) Dr. Steinert noted that visual acuity showed zero in the right eye and 20/50 in the left eye. *Id.* Dr. Steinert, however, also reported that the plaintiff had 20/40 in "both" eyes with glasses. *Id.* Ultimately, Dr. Steinert's diagnosis relating to the claimant's eyesight was "blindness in the right eye." *Id.* at 178.

The plaintiff argues that these findings are inconsistent and, therefore, a mistake in the medical record. Specifically, the plaintiff contends that the finding of zero acuity in the right eye is incompatible with a determination of 20/40 for both eyes with glasses. Importantly, the ALJ, at the administrative hearing, appeared to agree with the plaintiff:

ALJ:   The bad eye?

Clmt:  I don't have no vision at all, I never did.

ALJ:   Even with your glasses on?

Clmt:  Yes, sir, yes, sir.

ALJ:   So you would say then, I assume, well, I'll just leave it at that. Obviously you're implying that that's incorrect, that is when it says 20/40 in both eyes or 20/50.

. . .

ALJ: **It just says both 20/40 with glasses. Now it's really, it's really, looking at it more closely it's a little inconsistent, Mr. Swan. It does say right, it says visual acuity right, zero, left 20/50. Then both 20/40 with glasses, so I, I really don't know how to read that.**

Atty: I don't either.

ALJ: I think I'll take it with a grain of salt. . . .

(R. at 211-12 (emphasis added).)

In fact, as the plaintiff contends, the ALJ did not take the Report of Dr. Steinert with "a grain of salt." Instead, and without any qualification, the ALJ cited the rote findings of the Report 4 times in his decision, in regards to both his credibility and RFC determinations:

> Additionally, the claimant's vision in her left eye is 20/50, and 20/40 in both eyes with glasses. (R. at 16.)
>
> The claimant was provided with an eye examination, which revealed blindness in the right eye secondary to a cataract, a visual acuity of 20/50 on the left, and a best corrected visual acuity of 20/40 in both eyes. (R. at 18.)
>
> A consultative examination in November 2005 revealed blindness in the right eye secondary to a cataract with a visual visual acuity of 20/50 on the left and a best-corrected acuity of 20/40 in both eyes. (R. at 20.)
>
> Upon consultative examination, in November 2005, the claimant had a best-corrected visual acuity of 20/40 in both eyes (despite a right eye cataract in the right eye and 20/50 vision on the left. (R. at 21.)

Not only was the ALJ not dismissive of the Report as he suggested he was inclined to be, at the hearing, he specifically used it to diminish the plaintiff's credibility and find her able to work. (R. at 20, 21.) Notwithstanding their importance to his ultimate determination, the ALJ made no explanation of why he now believed the various findings in the Report were *consistent*, where he had previously found them inconsistent.

The defendant would argue that the Report plainly must mean that with the aid of glasses, the plaintiff can, in fact, see 20/40 using both eyes. But, this is not a reasoning expressed in the ALJ's decision and one the undersigned is unqualified to measure.

6

Rather, it is an impermissible post-hoc rationalization. *See Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steel v. Barnhart*, 290 F.3d 936 (7th Cir. 2002) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). Theoretically, it is just as likely that the ALJ forgot the discrepancy, previously brought to his attention, which he readily recognized, or that he ignored it altogether.

The Court cannot know the ALJ's reasoning, which is precisely the problem with the decision. The ALJ acknowledged a problematic issue in the medical record but never resolved it. And, frankly, the Court is not sure that the ALJ could have resolved it without recourse to expert testimony or a clarifying statement from Dr. Steinert. "An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). As a lay person, an ALJ is "simply not qualified to interpret raw medical data in functional terms . . . ." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *see also Manso-Pizarro v. Sec'y of Health & Human Services*, 76 F.3d 15, 17 (1st Cir.1996) (stating that "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record"); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence."); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982) ("Because an Administrative Law Judge as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony."). The plaintiff emphasizes that Dr. Steinert is neither an ophthalmologist or an optometrist.

So, to the extent the ALJ expressed concern over the veracity of the Report, which he could not explain, it seems that it would have been incumbent upon him to seek out clarifying evidence. The Court believes that the Report is sufficiently suspicious that, in light of the ALJ's own professed concern over it, at least some explanation should have been given before the Report would be so heavily relied upon.

The Court would recommend remand for further clarification. Additional medical evidence may be necessary to resolve any conflict in the evidence. The Court concedes that the ALJ found no limitations placed on her activities as a result of her vision problems. (R. at 16, 21.) This would tend to support the conclusion that the findings in the Report are as indicated. The Court's concern, however, lies in the ALJ's initial and fairly sympathetic reaction to the evidence. The lack of discussion in the decision is troublesome under the circumstances.

**II.   LISTING 12.05**

The plaintiff next contends that the ALJ failed to recognize that medical evidence established the presence of a disabling mental impairment listed in section 12.05 of Appendix 1 to 20 C.F.R. § 404, Subpart P. Section or Listing 12.05 states in relevant part:

> 12.05 Mental Retardation and Autism: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) . . . The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.
>
> . . .
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> C. A valid verbal, performance, or full scale I.Q. of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitations of function;
>
> . . .

20 C.F.R. pt. 404, Subpart P, App. 1, § 112.05. Under Section, 12.05(B), therefore, if the plaintiff demonstrates an IQ score of less than 60 she is automatically considered disabled.

8

In contrast, there are two requirements under Section 12.05(C). *See Boatwright v. Secretary, Dept. of Health and Human Services*, 1989 WL 79720, at *2 (4th Cir. July 12, 1989). First, a claimant's I.Q. score must come within the listed range of 60 to 69 inclusive, and second, he must be able to demonstrate an additional significant limitation. *See id.* at *2. If both requirements are met, then the plaintiff is considered disabled and entitled to benefits. *See id. at *3;* 20 C.F.R. § 416.920(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.").

The defendant argues that the plaintiff also must satisfy the diagnostic description in the introductory paragraph of Listing 12.05 in addition to one of the four sets of criteria, defined in subsections A, B, C, or D. As quoted above, that introductory paragraph states mental retardation "refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior . . . ." 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05. This argument is not unfamiliar to the undersigned and has posed on prior occasions, and even until now, a source of confusion. The prevailing view among the circuit courts of appeal appears to unequivocally confirm the defendant's position. A recent and thorough discussion by the Fifth Circuit, which included a survey of relevant decisions, concluded that a claimant must, in fact, establish both the diagnostic portion of the introductory paragraph in addition to one of the severity indicators, delineated in subsections A - D. *See Randall v. Astrue*, --- F.3d ----, 2009 WL 1578236, at *4-7 (5th Cir. June 8, 2009). The Fourth Circuit has apparently not directly considered it.

The Court, of course, without compelling alternative guidance from the Fourth Circuit would defer to the essentially uniform judgment of other circuits. But, in application, questions still remain. To the Court, the language of the regulation, has always implied that if a plaintiff satisfies the requirements of one of the subsections of Section 12.05, then he has necessarily demonstrated the diagnostic portion of the introductory paragraph – that he has "significantly subaverage general intellectual functioning." *See* 12.05 of Appendix

9

1 to 20 C.F.R. § 404, Subpart P ("The required level of severity for this disorder *is met when* the requirements in A, B, C, or D are satisfied." (emphasis added)). The Fifth Circuit and other courts reason, however, that the introductory paragraph is purely diagnostic in quality while the subsections relate only to severity. To the Court, the bright-line characterization of the two portions of the Listing is somewhat confusing. It would seem that the introductory paragraph and the subsections both contain language that appears to relate to both severity and diagnosis. The phrase "significantly subaverage" certainly goes to severity but also has a diagnostic quality. Again, "deficits in adaptive behavior" seems to be a severity consideration. And while they are clearly distinct considerations, the precise analytical difference between the phrase "deficits in adaptive behavior" in the introductory paragraph and "additional and significant work-related limitation of function" in the subsection C eludes the undersigned.

To be more specific and by way of example, the defendant has emphasized all of the activities of the plaintiff, the rearing of her son, the fact that she graduated high school, her household chores, and prior gainful employment as evidence that she has no deficits in adaptive functioning. (R. at 87, 90, 91-98, 180, 198, 206-09.) These were the same considerations identified by they ALJ. (R. at 17.) But, does that mean that she lacks "deficits in adaptive behavior," as required by the introductory paragraph, or is that evidence of no "additional and significant work-related restrictions," required by subsection C? The ALJ analyzed them in the context of the former (R. at 17), while the defendant would argue them in the context of the latter. Which goes to the point: the section does not easily break down between diagnostic and severity components. It seems to the court that a valid IQ score of a certain threshold tends to establish diagnosis, where a consideration of functional limitations tends to establish severity. And where the diagnosis criteria is in some grey range, to wit, 60-70, then an additional severity criteria is required – proof of an additional and significant work-related limitation of function. But where the IQ score falls below, 60, for example, as provided in subsection B (assuming the scores validity), then one would

have in that score, arguably, a sufficiently strong indicator of both diagnosis and severity to not require some additional severity analysis. Or at least, that seems to be one reasonable interpretation of the Listing.

The Court would concede, however, that, in addition to clear case law on point, the plain language of the regulations seem to confirm the defendant's position:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

*See id.* 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.00(A).

Ultimately, the Court is compelled to examine the diagnostic consideration in the introductory paragraph in addition to the rote score and functional considerations contained in the severity criteria, one of which must be present. The enduring problem, however, is that the ALJ himself did not do this. As stated, the ALJ does not argue that the plaintiff failed to satisfy the diagnostic portion of the Listing. (R. at 17.) That is the position the defendant has staked on appeal.

This poses a problem for the Court in regards to subsection B, which the ALJ did not address. The plaintiff's *Full Scale IQ* score was 58. (R. at 181.) A score that satisfies Criteria B of Listing 12.05. 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05(B). The ALJ identifies that Full Scale score as a 65 not 58. (R. at 18.) At the very least, this raises concerns about whether the ALJ was relying on accurate information. There is no discussion in the ALJ's decision or between the parties on appeal as to the discrepancy, as far as the Court can tell. Moreover, Criteria B contains no additional functional requirement like Criteria C. And, since the ALJ did not reject the plaintiff's ability to satisfy the Listing based on the *introductory paragraph*, and only the functional requirement contained in Criteria C, there seems to be no explanation for why the plaintiff would not

11

satisfy 12.05(B). On this basis alone, the Court would be inclined to request a fuller explanation from the ALJ.

But the plaintiff has not appealed subsection (B) and, at the hearing, counsel stated that only subsection (C) was being alleged. (R. at 197.) Accordingly, the Court would not recommend remand for consideration of subsection (B). If, however, on objections to this recommendation, the district court finds a basis to so consider subsection (B), it would be this Court's opinion that the case should be remanded for additional examination.

In regards to subsection (C), it seems that the matter is a close call. The plaintiff posted the following scores on the WAIS-III test:

| | |
|---|---|
| Full Scale IQ | 58 |
| Verbal IQ | 62 |
| Performance IQ | 59 |
| Verbal Comprehensive index | 61 |
| Working Memory Index | 63 |
| Perceptual Organization Index | 65 |
| Processing Speed Index | 68 |

(R. at 181.) So it is undisputed that the plaintiff satisfies the score requirement of the Listing.

Dr. Sherry Rieder, the administering clinical psychologist concluded that the plaintiff had "intellectual capacity in the borderline to mild mental retardation range . . . ." (R. at 182.) Dr. Rieder also found that the plaintiff's "performance on tasks involving verbal comprehension, word knowledge, working memory span, simple mental calculations, and general fund of knowledge, mental sequencing abilities, and mathematical abilities was consistently impaired." (R. at 181.) In the nonverbal domain, Dr. Rieder stated that the plaintiff "again demonstrated consistently impaired performance across domains, including recognition of essential missing details in pictures, visuospatial organization and construction, visuomotor sequencing and scanning, and nonverbal inductive." (R. at 181.)

12

The Court is not aware of any reason why these findings would not satisfy the "deficits in adaptive behavior" element of the introductory paragraph.

The ALJ rejected that the plaintiff's mental impairments satisfied 12.05(C) because in spite of these findings, Dr. Rieder also found that the plaintiff's "academic achievements in math and spelling particularly indicate a higher level of functioning (7-8th grade level range)." (R. at 182.) The ALJ adopted Dr. Rieder's guess that the "discrepancy in intellectual capacity and achievement could be due to . . . sub-optimal effort on the WAIs, which was used to measure intellectual capacity" (R. at 182). (R. at 18.)

To the Court, there are numerous problems with the ALJ's decision to so rely on the report. First, Dr. Rieder actually posits two theories for the discrepancy: sub-optimal effort or *rigorous training in math and spelling*. (R. at 182.) Without explanation, the ALJ only acknowledged the one. Second, Dr. Rieder's language is completely speculative. She did not *observe* sub-optimal performance and she had no specific knowledge of prior rigorous academic training. *See id.* Dr. Rieder was merely positing possible explanations. The defendant claims that Dr. Rieder found that the plaintiff "put forth sub-optimal effort during IQ testing . . . ." (Def. Brief at 13.) But that is not what Dr. Rieder concluded. She made no accusation as to the plaintiff's *actual* effort. She merely surmised that effort was one possible explanation. Lastly, there is no indication of what range Dr. Rieder truly believed the plaintiff's IQ to fall. Simply because Dr. Rieder viewed the rote scores as an underestimate does not mean that they were, therefore, automatically not within a range that satisfied the Listing criteria.

Even still, the Court believes the ALJ's determination was justified. The defendant represents that the Diagnostic and Statistical Manual of Mental Disorders states that "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision (DSM-IV-TR), note (4th ed.

1994). To that end, the ALJ notably considered the plaintiff's independence in performing a variety of activities, already noted above. (R. at 17.) Those incidents of adaptive behavior are not contested by the plaintiff and qualify as substantial evidence. In *Randall*, a diagnosis of "mild/borderline" retardation, as is present here, was not dispositive of the issue whether the plaintiff met the Listing and, in fact, was evidence that the plaintiff did not have significant adaptive deficits. *See Randall v. Astrue*, 2009 WL 1578236, at *8.

The fact that the plaintiff has come forward with other evidence that she was impaired in her daily activities and her interaction with others (R. at 116, 181-82, 177-78, 199) is of no moment. The ALJ was entitled to credit one set of evidence over another. Simply because the plaintiff can produce conflicting evidence which might have resulted in a contrary interpretation is of no moment. *See Blalock*, 483 F.2d at 775. As recited, the ALJ had substantial evidence to conclude as he did and the Court will not disturb his decision.

The Court is not expert in mental impairments. The regulations recognize that rote IQ scores do not tell the whole truth about a persons capacity to function. This seems an imminently reasonable presumption. The Court, however, always has concerns where great effort is seemingly expended to determine that an individual can, in fact, work, where they undoubtedly suffer subaverage IQ scores, even if within a debatable margin of error.

That being said, the Court would not recommend remand on this issue. The ALJ, as noted, cited evidence that justifiably led him to believe that the plaintiff did not suffer an additional and significant work-related limitation of function. *See* 20 C.F.R. pt. 404, Subpart P, App. 1, § 112.05(B).

### III. Combination of Impairments

The plaintiff next contends that the ALJ failed to analyze whether the combined effect of the plaintiff's impairments was medically equivalent to a listed impairment. The ALJ is required to determine if a claimant has a combination of impairments which are medically equivalent to a listed impairment, even if no one impairment met any listing singly. 20 C.F.R. §§ 404.1526(b)(3). Moreover, when a claimant suffers from multiple

impairments, the ALJ must consider their combined effect in determining whether the claimant is disabled. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Hicks v. Gardner*, 393 F.2d 299, 301 (4th Cir. 1968). Congress has explicitly required that "the combined effect of all the individual's impairments" be considered, "without regard to whether any such impairment if considered separately" would be sufficiently severe. 42 U.S.C. § 423(d)(2)(c); *see also Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir.1989). As an important "corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker*, 889 F.2d at 50.

The plaintiff complains that the ALJ fragmented the analysis, considering each impairment in isolation, but never together. There are two problems with the plaintiff's objection. First, the Court would not characterize the ALJ's analysis as fragmented. The ALJ expressly concluded that the plaintiff did not have an "impairment or combination of impairments that meets or is medically equals one of the listed impairments." (R. at 16.) Moreover, the ALJ's analysis moved fluidly between the various impairments, reconsidering them at each stage. (R. at 16-19.)

Critically, however, the plaintiff, herself, has not explained what Listing she would have satisfied had the impairments been viewed more expressly in combination. The plaintiff cannot prevail on this objection because she has not presented evidence that the combined effects of her impairments would equal any Listing. The United States Supreme Court has stated, "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis added) (quoting 20 CFR § 416.926(a)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id*. In other words, the combination of impairments does not meet a Listing simply by virtue of the overall functional

15

impact of those impairments. The plaintiff must still demonstrate how the impairments, when taken together, meet the specific criteria of the Listing in question.

The plaintiff has failed to so demonstrate on appeal. The plaintiff has not identified to which specific listing her combined impairments are equivalent nor has she explained how her impairments meet the specific criteria of any such listing. Even if the ALJ did not properly consider evidence of the plaintiff's impairments in combination, the plaintiff has made no attempt to demonstrate how such consideration would have demonstrated that the criteria of Listing 12.05 or some other Listing was satisfied. Instead, she has generally put forward evidence that her overall functional level was substantially diminished by the combination of such impairments. (R. at 116, 181-82, 177-78, 199.) That is not sufficient. *See Sullivan*, 493 U.S. at 531. Therefore, any error of the ALJ in considering or explaining the combined effects of the plaintiff's impairments is harmless, in the absence of evidence that the outcome would have been different. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

## IV.    INCOMPLETE RECORD

The plaintiff has also requested remand on the basis that certain portions of the transcript are missing. Specifically, testimony is missing at pages 201, 207, 209, and 213 of the Record. As the plaintiff contends, it is true, in the most generalized sense, that "[r]eversal and remand to the Commissioner for further proceedings is the usual remedy when the administrative record is incomplete . . . ." *See Deas v. Astrue*, 2008 WL 4177272, at *13 (D.S.C. September 05, 2008). But typically there must be some "indication that the missing portion of the transcript would bolster appellant's arguments or prevent judicial review . . . ." *Williams v. Barnhart*, 289 F.3d 556, 557-58 (8th Cir. 2002). The Court has recommended remand based on the visual acuity issue. Remand for the incomplete record issue is, therefore, unnecessary. And while the Court might have declined to remand on this basis alone, the Court would recommend that the plaintiff be granted leave, on remand, to develop the record in regards to holes in her testimony she believes are material.

16

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, the Court cannot conclude that the ALJ' s decision to deny benefits, in certain respects, was supported by substantial evidence. It is, therefore, ORDERED, for the foregoing reasons, that the Commissioner's decision be reversed and remanded under sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings as set forth above. *See Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

IT IS SO RECOMMENDED.

                                           s/Bruce Howe Hendricks
                                           United States Magistrate Judge

July 23, 2009
Greenville, South Carolina